IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

SAM EDWARD THURMOND, SR., ADC #127149;                          PLAINTIFFS
KHALAN ELLINGTON, ADC #655082;
RASHAN DIXON, ADC #108165;
BOBBY RAY WYLES, JR., ADC #149401;
TERRY DON BEAVER, ADC #657603;
JEREMY TODD HALEY;

v.                          4:17CV00222-JTK
                            4:17CV00223-JTK
                            4:17CV00224-JTK
                            4:17CV00248-JTK
                            4:17CV00289-JTK
                            4:17CV00368-JTK

TIM RYALS, Sheriff, Faulkner County; et al.                     DEFENDANTS

**MEMORANDUM AND ORDER**

**I.    Introduction**

Plaintiffs are former inmates of the Faulkner County Detention Center (Jail), who filed pro se actions pursuant to 42 U.S.C. § 1983, alleging unconstitutional conditions of confinement. The Court granted their individual Motions to Proceed in forma pauperis and assessed filing fees in each of their cases, and then consolidated them into Thurmond v. Ryals, et al., 4:17cv00222-BSM-JTK.[1] On December 18, 2017, the parties consented to my jurisdiction. (Doc. No. 55)

This matter is before the Court on the Motion for Summary Judgment, Brief in Support, and Statement of Facts (Doc. Nos. 96-99) filed by Defendants Tim Ryals, Gary Andrews, and Chris Riedmueller. Plaintiffs filed a Response, Brief in Support, and Statement of Facts (Doc. Nos.

---

[1] Plaintiff James Cunningham was dismissed on September 17, 2017, for failure to prosecute. 4:17cv00375.

100-102).

## II.   Complaints

Plaintiffs alleged that they were housed in unconstitutional living conditions at the Jail during different time periods between 2016 and 2018. Specifically, and common to all their complaints, Plaintiffs alleged the presence of black mold on the walls, ceiling and floors of the showers in three different cells (212, 305, 306) in Unit 1 of the Jail. The presence of the mold caused numerous health problems to the Plaintiffs, including headaches, sinus conditions, skin rashes and irritations, and breathing problems.

## III.   Depositions and Evidence

### A.   Plaintiffs

Plaintiffs were incarcerated in Unit 1 of the Jail as pretrial detainees during different times from 2016-2018. Specifically, Plaintiffs Thurmond and Wyles were there from February 2017 through June 2017. (Doc. No. 100-6, p. 15; Doc. No. 100-7, p. 13). Ellington was incarcerated from August 2016-November 2016, and then again from February 2017-March 2017. (Doc. No. 100-8, pp. 17, 19) Haley was in the Jail from May 2017 until February 2018, and Dixon was there from June 2016-April 2017. (Doc. No. 100-9, p. 12; Doc. 100-10, p. 17) Beaver was at the Jail from March 2017-December 2017. (Doc. No. 100-5, p. 7). They all testified in depositions that during their incarcerations they were exposed to mold in and directly outside of the showers on the walls, ceilings and floors. Specifically, "splatters of it everywhere. It looked like it was draining down the wall. Had kind of – some of it had a little fur coming off of it, it looked like....Some of it was round, ...it felt like there was something nasty on it, ... it's soft,...pretty thick." (Deposition of Terry Beaver, Doc. No. 100-5, p. 10) Plaintiff Thurmond testified about black mold and fungus

all over the shower and shower curtains and described it as "black and gooey. It was sticking to the wall." (Doc. No. 110-6, pp. 11-12) Plaintiff Wyles described the problem as a "fungus-type thing growing....blackish...like a foam, kind of substance-looking stuff...It was real inhumane looking." (Doc. No. 100-7, p 8) The inmates stated that they never received cleaning supplies, or if they did, they were limited to a mop, brush and bucket, but no chemicals. (Doc. No. 100-6, pp. 36-37; Doc. No. 100-7, p. 9; Doc. No. 100-9, pp. 31- 32; Doc. No. 100-10, p. 37).

After Plaintiffs filed grievances about the conditions between February 2017 and April 2017 (Doc. No. 100-13), Act 309 inmates came to power wash the showers, and painted Kilz on the walls. (Doc. No. 100-7, pp. 10-11; Doc. No. 100-8, p. 33; Doc. No. 100-9, p. 32; Doc. No. 100-10, p. 17) However, the mold reappeared on the walls, ceilings and floors within a week or two of the treatments. (Doc. No. 100-6, p. 51; Doc. No. 100-7, pp. 10-11; Doc. No 100-5, p. 29; Doc. No. 100-10, p. 36) These conditions caused Plaintiffs to suffer from numerous medical conditions, including skin rashes, migraine headaches, coughs, burning in the chest, anxiety and breathing difficulties. (Doc. No. 100-5, p. 13; Doc. No. 100-6, pp. 21, 25; Doc. No. 100-7, pp. 14-15; Doc. No. 100-8, pp. 23-24; Doc. 100-9, pp. 24-25; Doc. No. 100-10, pp. 25, 32)

**B.     Defendants**

Defendants are Faulkner County Sheriff Tim Ryals, Jail Administrator Chris Riedmueller, and Lt. Gary Andrews. Ryals stated that while he ultimately is responsible for the Jail, personnel, and inmates, the Jail Administrator (Riedmueller) is "hands on" at the facility. (Doc. No. 100-1, p. 4) In the spring or summer of 2017, Ryals first became aware of mold complaints during a meeting with Riedmueller. (Id., p. 5) He told Riedmueller to have someone check to make sure that there was not a dangerous type of mold present at the Jail. (Id., p. 9)

Riedmueller became Jail Administrator in January 2017 and is responsible to the Sheriff for the overall operations of the Jail. (Doc. No. 100-2, p. 21) Andrews notified him in the Spring of 2017 about an increase in mold complaints through grievances, and he told Andrews to make sure the cells were being properly cleaned. (Id., pp. 18, 20) Riedmueller conducts random checks in the Jail areas to ensure that staff keep the facility in accordance with Jail policy, which requires that the facility be kept in the highest degree of cleanliness possible. (Id., pp. 24-25) However, at his deposition, he testified that he did not recall if he personally inspected the cells at issue after Andrews told him about the mold complaints. (Id., p. 40) He also notified Ryals about the mold issue during an administrative meeting, and they agreed to have the facility environmentally-tested. (Id., p. 33)

Lt. Andrews, who testified that cleaning and inspections are part of his job, stated he first received complaints about mold in Unit 1 in June 2016. (Doc. No. 100-3, pp. 6-7) At that time, inmates were responsible for cleaning the common areas. (Id., p. 7) After he received several more grievances, he decided to make changes because it became clear that the detainees were not properly cleaning the cells. (Id.) He inspected the cells and observed discoloration around the shower areas and attempted to remedy the problem by applying the areas with Kilz. (Id., p. 10) However, the inmates did not obey his directions to wait twenty-four hours before using the showers, and the Kilz washed off. (Id., p. 8) He then decided to use Act 309 inmates to power-wash the showers twice a week and to scrub the showers daily with a brush and cleaning material. (Id., p. 10)[2] Prior to that, there was active mildew growth on the walls, floor and ceiling of the

---

[2] Act 309 inmates are Arkansas Department of Correction (ADC) inmates who work different jobs at the facility. (Doc. No. 100-1, p. 13)

4

showers, which felt like a tub that had not been washed. (Id., pp. 10-11) After the cells were power-washed, the soap scum/mildew was not as prevalent, but the ceilings and walls remained discolored and stained, because they are made of a porous concrete. (Id., pp. 10, 14) Riedmueller testified that Andrews told him he did not think the problem was mold, but rather, sloughed-off skin cells and soap scum, and that the power washing was effective. (Doc. No. 100-2, p. 44)[3]

### C.   ATOKA Report

In June 2017, the Jail contracted with ATOKA, Inc., a professional engineering and environmental consulting services company, to conduct a mold and indoor air quality assessment of the Jail. (Doc. No. 100-2, p. 70, Doc. 97-1, pp. 78-88) According to the report ATOKA prepared for the Jail, surface samples were collected in eleven different settings and air samples were collected in four settings. (Doc. No. 97-1, p. 79) Mold growth was found in four of the eleven sites in wet areas, ranging from light to moderate growth. (Id., p. 80) No aerial growth was found and no airborne densities were described as "moldy." (Id.) The study found several areas of the Jail to contain the mold Cladosporium and/or yeast, and those included the second-floor men's shower ceiling, the shower in cell 213, the shower ceiling in cell 306, the ceiling at the hinged door in cell 305, and the shower wall in cell 307. (Id.)   The report explained that Cladosporium "is a common indoor contaminant implicated as an allergen." (Id.) Before an allergic response occurs in an individual, however, an individual must be sensitive to the allergen, and the overall type of reaction

---

[3] In his deposition, Riedmueller said he asked Andrews whether he thought there was a mold problem and to describe what it looked like. "And he [Andrews] reported to me, 'I don't believe it's mold. It looks – it looks like sloughed-off skin cells to me.' And he gave me an example of he was previously married to a Caucasian woman and now is married to an African-American woman. And he has noticed in his personal experience that the skin cells off a Caucasian woman does not leave a bathtub looking dirty, but his wife, the skin cells sloughing off, the darker color of her skin cells makes the bathtub look dirty." (Doc. No 100-2, p. 44)

experienced by an individual depends on how the allergen enters the body, the nature of the individual's sensitivity, and the nature of the allergen. (Id.)

According to photographs taken and included in the report, examples of staining and mold growth in the second-floor cell block varied from shower to shower, and the formation of stains consisted of a mixture of soap scum, skin cells, and some mold. (Id., p. 83) The ceilings that showed staining were moldy from the water spray coming from the shower. (Id.) In the third-floor cell block, the quality of air was not compromised by the existence of mold, and the density of mold on surfaces was held to the limits affected by moisture. (Id., p. 84) A check of the HVAC units found them well-maintained and that a small number of molds did not negatively affect the indoor air. (Id., p. 85) The report concluded as follows:

> Based on the evidence presented in this document, it is concluded that the presence of mold growth identified as Cladosporium, does not present a deleterious health effect for individuals living within the confines associated with the sporadic mold colonization in the showers and nearby ceilings. The presence of mold colonization is unsightly and is alarming because of its appearance.   For that reason, the following suggestions are offered as alternative procedures for maintaining a more suitable environment that is free of mold growth.
>
> <u>Evidence Based Conclusions</u>
>
> - Airborne spore concentrations within industry guidelines.
> - Mold growth is confined to those areas that remain wet.
> - There is no widespread, building-related mold problem.
> - Incidence of health-related mold problems among the detainees is not established.
> - Controls are available that can establish drier conditions, thus preventing mold growth.

(Id., p. 86). The report also recommended the following corrective actions to facilitate the improvement of site conditions which allow moisture accumulation to occur, and methods and products to use in removing mold growth:

Moisture Control (Suggestions)

- Limit showering to defined time periods in a single day.
- Provide a detail to dry the shower and adjoining walls/ceiling following the showering period.
- Change shower curtains more frequently.
- Examine air flow into and out of the cell blocks. Suggest a more balanced flow by modifications in exhausting air from the areas.
- Maintain a cleaner shower by more frequent cleaning and sanitizing. Follow suggested procedures outline (sic) below.

**Removal of Mold Growth**
...

- Clean and sanitize the exposed concrete surfaces as follows:

    - Spray apply Perasan A + Perafoam to all affected surfaces.
    - Enviro Tech's Perasan(R) A is a top of the line sanitizer for a variety of applications. Perasan A contains 5.6% peracetic acid and 26.5% hydrogen peroxide, with a small amount of acetic acid. Perasan A pairs highly effective antimicrobial properties with a very favorable environmental profile.
      NOTE: Safety Precautions must be observed when handling this product.
    -Allow to dry. No rinsing is needed except to wash away remaining residue.
    ...

- Patch and seal concrete surfaces using waterproofing products, as needed.

- Wet mop floors, using a mild detergent solution for mopping. Use only a slightly damp mop for cleaning. Mop cloth should be a micro-fiber fabric. Mist with a fungicide spray periodically......

(Id., p. 87).

When questioned about the recommendations of the report, Riedmueller stated that the Jail did not take into account the recommendations or change the way they were cleaning. (Doc. No. 100-2, p. 72) And Andrews stated that while Riedmueller briefed him of the results, he never read the report. (Doc. No. 100-3, p. 18)[4]

---

[4] Andrews stated, "I believe I heard the results that it was not the dangerous, health-concerned black mold....That it's not the health hazard black mold. That's – that's what I was told. Now, I

**D.     Expert Opinion**

Dr. Jim Ingram, retained as an expert by the Plaintiffs, is board certified in Pediatrics and Allergy and Immunology, and practices at Little Rock Allergy & Asthma Clinic, P.A. (Doc. No. 97-1, p. 50) He conducted allergy testing of the Plaintiffs on August 24, 2018, by using skin prick testing for numerous inhalants, including dust mites and indoor and outdoor molds. (Id., p. 51) The testing revealed that Plaintiff Thurmond is allergic to dust mites; Plaintiff Ellington is allergic to dust mites and the alternaria, aureobasidium, and phoma strands of mold; and Plaintiff Dixon is allergic to dust mites and the cladosporium, curvularia, and fusarium strands of mold. (Id.) Based on the symptoms described by those three Plaintiffs in their complaints and the ATOKA report, Dr. Ingram concluded that, "to a reasonably degree of medical certainty, these individuals more likely than not had allergies to certain allergens that could have produced these symptoms." (Id., pp. 51-52)   In his deposition testimony, he stated that a person must be allergic to mold in order to become sick from mold, and that the ATOKA inspection noted the presence of one strand of indoor mold, Cladosporium. (Doc. No. 97-1, pp. 22, 27, 33) He disagreed with the conclusion of the ATOKA report that the presence of mold growth does not present a deleterious health effect for the individuals living there, stating that if someone is allergic to Cladosporium and is exposed to it, he/she can suffer a deleterious health effect, and daily exposure can cause a serious risk of harm. (Id., pp. 44-45) Finally, Dr. Ingram identified the scientific name for black mold as Stachybotrys. (Id., p. 46)

---

couldn't tell you – I mean, I went to college but, you know, I'm not a scientist.   I couldn't – that's why I've never even tried to look at it. I've never got a copy of it, and I've never even tried to look at it. Wouldn't none of it make sense to me. I'm a bottom line guy, do we got it or do we not got it." (Doc. No. 100-3, p. 18)

8

IV.     **Summary Judgment**

    A.     **Standard of Review**

Pursuant to FED.R.CIV.P. 56(a), summary judgment is appropriate if the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  See Dulany v. Carnahan, 132 F.3d 1234, 1237 (8th Cir. 1997).  "The moving party bears the initial burden of identifying 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Webb v. Lawrence County, 144 F.3d 1131, 1134 (8th Cir. 1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (other citations omitted)).  "Once the moving party has met this burden, the non-moving party cannot simply rest on mere denials or allegations in the pleadings; rather, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'" Id. at 1135.  Although the facts are viewed in a light most favorable to the non-moving party, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." Id.

    B.     **Defendants' Motion**

        1.     **Qualified Immunity**

Defendants ask the Court to dismiss Plaintiff's monetary claims against them in their individual capacities, based on qualified immunity, which protects officials who act in an objectively reasonable manner.  It may shield a government official from liability when his or her conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified

9

immunity is a question of law, not a question of fact. McClendon v. Story County Sheriff's Office, 403 F.3d 510, 515 (8th Cir. 2005). Thus, issues concerning qualified immunity are appropriately resolved on summary judgment. See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (the privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").

To determine whether defendants are entitled to qualified immunity, the courts generally consider two questions: (1) whether the facts alleged or shown, construed in the light most favorable to the plaintiff, establish a violation of a constitutional or statutory right; and (2) whether that right was so clearly established that a reasonable official would have known that his or her actions were unlawful. Pearson v. Callahan, 555 U.S. 223, 232 (2009).[5]  Defendants are entitled to qualified immunity only if no reasonable fact finder could answer both questions in the affirmative. Nelson v. Correctional Medical Services, 583 F.3d 522, 528 (8th Cir. 2009).

Defendants state Plaintiffs cannot show that they were exposed to conditions which involve the "wanton and unnecessary infliction of pain," or that are "grossly disproportionate to the severity of the crime," as set forth in Rhodes v. Chapman, 452 US. 337, 347 (1981). They state Plaintiffs also cannot produce evidence to show that their conduct objectively rose to the level of a constitutional violation and reflected a subjective state of mind of deliberate indifference to Plaintiffs' health or safety, citing Revels v. Vincenz, 382 F.3d 870, 875 (8th Cir. 2004). Defendants note that Plaintiffs' expert did not conclude that mold or any other allergen actually

---

[5]Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Nelson, 583 F.3d at 528 (quoting Pearson v. Callahan, 555 U.S. at 236).

caused any of their health problems, and stated that a number of other environmental, lifestyle and historical factors can cause symptoms similar to an allergic reaction.   Finally, they state Plaintiffs cannot establish deliberate indifference because the Jail staff responded Plaintiffs' complaints by engaging in clean-up and remediation efforts such as power-washing, using Kilz primer, and arranging the ATOKA inspection.   Based on the evidence, Defendants state that Plaintiffs cannot show that they acted unreasonably or violated clearly-established statutory or constitutional rights.

    **2.**    **Respondeat Superior**

Defendant Ryals asks the Court to dismiss him from the Complaint because Plaintiffs failed to allege facts to show his specific involvement or direct responsibility for the cell conditions. Two of the Plaintiffs stated in their depositions that they sued Ryals because he was the man in charge and because his employees failed to provide constitutional conditions. (See Thurmond Deposition, Doc. No. 100-6, p. 49; Ellington Deposition, Doc. No. 100-8, p. 13) However, respondeat superior liability does not apply under § 1983, absent a showing of personal involvement or knowledge. See Messimer v. Lockhart, 702 F.2d 729, 731 (8th Cir. 1983).

    **3.**    **Official Capacity (County) Liability**

Defendants also ask the Court to dismiss Plaintiffs' claims against them in their official capacities because Plaintiffs produced no evidence to show that a policy or custom led to the alleged constitutional violations. See City of Canton, Ohio v. Harris, 489 U.S. 378 (1989). Defendants produced several Jail policies which govern the cleaning and sanitation of the Jail. (Doc. No. 99-3)

    **B.**    **Plaintiffs' Response**

        **1.**    **Qualified Immunity**

Plaintiffs state Defendants are not entitled to qualified immunity because their conduct violated a clearly established constitutional right to sanitary prison conditions, citing Howard v. Adkison, 887 F.2d 134, 137 (8th Cir. 1989), where the court stated that "[c]onditions, such as a filthy cell, may 'be tolerable for a few days and intolerably cruel for weeks or months.'" (quoting Hutto v. Finney, 437 U.S. 678, 687 (1978) (other citations omitted)). In support, Plaintiffs note the ATOKA report findings of mold in the showers, and the fact that Defendant Andrews was first aware of a complaint in June 2016, yet did not take any remedial action until after the Plaintiffs filed their grievances in the Spring of 2017. In addition, Defendant Riedmueller admitted that he was not sure if he visited the cells following the complaints and that the Jail had not adopted any of the corrective measures for the shower areas outlined in the ATOKA report. Defendant Andrews also admitted that he never read the report. Plaintiffs state that these actions evidence deliberate indifference by the Defendants.

Plaintiffs also refer to Dr. Ingram's conclusion that the presence of mold growth can cause deleterious health effects, especially since Plaintiffs Ellington and Dixon are allergic to mold and experienced rashes, sinus issues, headaches, and other allergic symptoms.

### 2. Respondeat Superior

Plaintiffs also argue that Defendant Ryals should be held liable because he testified that any time red flags were raised, he became personally involved. (Doc. No. 100-1, p. 7) In addition, Plaintiffs note Ryals' personal knowledge of the grievances and his responsibility for answering grievance appeals, yet he disclosed he does not respond to grievance appeals and forwarded that responsibility to Defendant Andrews. (Doc. No. 100-17, pp. 2-3)

### 3. County Liability

While Faulkner County maintained policies and procedures in place at the Jail, Plaintiffs argue that County liability may be established through proof that the alleged misconduct was so pervasive that it constituted a custom or usage with the force of law, citing McGautha v. Jackson Cty., Mo. Collections Dep't., 36 F.3d 53, 56 (8th Cir. 1994). Specifically, Plaintiffs and other inmates filed lawsuits about the mold, which they claim evidence a custom of allowing the conditions to prevail.[6] In addition, Defendants failed to take any action in response to inmates' complaints until numerous civil lawsuits were filed. Finally, Plaintiffs note that Defendant Andrews testified that "just because somebody is complaining don't mean that there's something wrong, you know. And so you have to take everything in a jail setting with a grain of salt." (Doc. No. 100-3, p. 20)

**C.     Analysis**

    **1.     Qualified Immunity**

As noted above, to determine whether Defendants are entitled to qualified immunity, the courts generally consider two questions: (1) whether the facts alleged or shown, construed in the light most favorable to the Plaintiffs, establish a violation of a constitutional or statutory right; and (2) whether that right was so clearly established that a reasonable official would have known that his or her actions were unlawful. Pearson v. Callahan, 555 U.S. at 232. Since Plaintiffs were pretrial detainees at the time of their incarcerations, the due process standard of the Fourteenth Amendment applies to determine the constitutionality of their conditions of confinement. "Under the Fourteenth Amendment, pretrial detainees are entitled to 'at least as great' protection as that

---

[6] Two other federal court lawsuits filed by inmates Stacy and Fowlkes were referenced in Defendant Andrews' deposition. (Doc. No. 100-3, p. 19)

afforded convicted prisoners under the Eighth Amendment." Owens v. Scott County Jail, 328 F.3d 1026 (8th Cir. 2003) (quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)). "In order to support an Eighth Amendment violation, Plaintiff[s] must prove the existence of objectively harsh conditions of confinement, together with a subjectively culpable state of mind by prison officials in condoning or creating the conditions. Choate v. Lockhart, 7 F.3d 1370, 1373 (8th Cir.1993). The 'defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the 'minimal civilized measure of life's necessities.'... The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner.'" Amerson v. Outlaw, No. 2:11-CV-00130-BSM, 2012 WL 1579556, at *6 (E.D. Ark. Mar. 28, 2012), report and recommendation adopted, No. 2:11CV00130 BSM/JTK, 2012 WL 1579525 (E.D. Ark. May 4, 2012) (quoting Revels v. Vincenz, 382 F.3d 870, 875 (8th Cir.2004); Rhodes v. Chapman, 452 U.S. 337, 342 (1981); and Estelle v. Gamble, 429 U.S. 97, 104 (1977)).

"[I]nmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time." Howard v. Adkison, 887 F.2d at 137. In determining when pretrial detention is considered unconstitutionally punitive, the courts apply the Eighth Amendment deliberate indifference standard, focusing on the length of exposure to unsanitary conditions and the degree to which the conditions are unsanitary. Whitnack v. Douglas County, 16 F.3d 954, 957 (8th Cir. 1994).

Given this case law and the facts and evidence set forth by the parties, the Court finds that Plaintiffs' constitutional right to sanitary prison conditions is clearly established. In addition, the Court finds genuine disputes of material fact as to whether Defendants violated those rights; that

is, whether they acted with deliberate indifference, or reckless disregard for, the safety, health and well-being of the Plaintiffs.

     First, the record is unclear how long the Defendants were aware of the problem before they attempted to remedy it. Andrews testified that he received the first complaints in June 2016 and admitted that he did not immediately act and did not take remedial action until after the Plaintiffs filed this lawsuit in April 2017. (Doc. No. 100-3, pp. 7, 10) Although he also testified that as the Lieutenant in charge of Unit 1 he was in charge of cleaning and inspections of the facility (Doc. No. 100-3, p. 6), it is not clear from his testimony if he ever checked the facilities at issue (between June 2016 and the time of this complaint) to ensure that they were being properly cleaned. In fact, he admitted that when he did check, after he received the Plaintiffs' lawsuit, he found that the inmates were not cleaning the showers properly and that there were substances on the walls and floors of the showers and discoloration on the ceilings, "active mildew growth." (Id., pp 10-11) Andrews also testified that he did not recall when he directed that the cells be power-washed, only that it was after he became aware of the complaints, and in his December 7, 2018 deposition, he stated that the cells had been cleaned by power-washing for about a year. (Id., p. 7) Therefore, approximately eighteen months may have passed between the first mold complaints and the first power-washing of the cells.

     Riedmueller testified Andrews first notified him of the problem in the Spring of 2017 and that he told Andrews to ensure the cells were properly cleaned. (Doc. No. 100-2, pp. 18, 20) He also admitted that he is responsible to the Sheriff for the overall operation of the facility and that it is his responsibility to keep the Jail in the highest degree of cleanliness possible, per Jail policy. (Id., pp. 21, 24) After consulting with Sheriff Ryals, Riedmueller agreed to the environmental tests

by ATOKA and to the subsequent power washing by the Act 309 inmates. (Id., pp. 33, 37) Yet, he stated that he does not recall if he ever personally inspected the areas at issue and admitted the Jail did not adopt the sanitation recommendations of the ATOKA report. (Id., pp. 40, 72)  Therefore, the Court finds a sufficient dispute of fact as to whether the conditions were unconstitutional and whether Defendants Riedmueller and Andrews recklessly disregarded those conditions.

Next, although the Jail invested in an environmental study to determine the presence of a mold issue, neither the Jail Administrator, Chris Riedmueller, nor the officer in charge of cleaning and inspections, Lt. Gary Andrews, adopted the report's suggestions for controlling moisture and removing mold growth, and did not change the way the facility was cleaned. (Doc. No. 100-2, p. 72)  Defendant Andrews, who is in charge of the cleanliness of the property, admitted that he never read the ten-page report once Riedmueller told him that black mold was not present in the facility. (Doc. No. 100-3, p. 18) The photographs of the shower areas which appear in the ATOKA report also contribute to a dispute concerning the constitutionality of those conditions. (Doc. No. 97-1, pp. 83-85)

There is also a sufficient factual dispute concerning whether the conditions of the facility caused harm to the Plaintiffs.  Although the study found no black mold, the Cladosporium strand of mold and yeasts were found in four of the eleven sites tested. (Doc. No. 97-1, p. 80). In addition, although the study concluded "no widespread, building-related mold problem," it also concluded that "[t]he presence of mold colonization is unsightly and is alarming because of its appearance. For that reason, the following suggestions are offered as alternative procedures for maintaining a more suitable environment that is free of mold growth." However, Dr. Ingram disagreed with the study conclusions that the levels of mold present in the facility did not present a deleterious health

effect, stating that a person allergic to Cladosporium and exposed to it on a daily basis would be at risk of serious harm. (Doc. No. 97-1, p. 45) And the ATOKA report even noted that "each person's reaction is unique to that person." (Doc. No. 97-1, p. 80)   All the Plaintiffs testified as to having suffered various allergy-type symptoms while incarcerated at the Jail, including rashes, sinus issues, headaches, anxiety, and breathing difficulties. (Doc. No. 100-5, pp. 11-18; Doc. No. 100-6, pp. 14, 21, 25; Doc. No. 100-7, pp. 13-15; Doc. No. 100-8, pp. 22-24; Doc. No. 100-9, pp. 22-25; Doc. No. 100-10, pp. 23-28) Therefore, the Court finds a sufficient dispute of fact concerning whether the presence of mold and other unsanitary substances in the showers caused harm to the Plaintiffs.

### 2.     Respondeat Superior

Supervisor liability is limited in § 1983 actions, and a supervisor cannot be held liable on a theory of respondeat superior for his or her employee's allegedly unconstitutional actions. See White v. Holmes, 21 F.3d 277, 280 (8th Cir. 1994).   A supervisor incurs liability only when personally involved in the constitutional violation or when the corrective inaction constitutes deliberate indifference toward the violation. Choate v. Lockhart, 7 F.3d at 1376. In particular, the plaintiff must show that the supervisor knew about the conduct and facilitated it, approved it, condone it, or turned a blind eye to it. Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995). See also Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1997) ("Section 1983 liability cannot attach to a supervisor merely because a subordinate violated someone's constitutional rights.").

According to the Faulkner County Detention Center policy and Arkansas Code Annotated section 12-41-502, the sheriff has the custody, rule and charge of the jail within his county and all prisoners committed in the county, and he may appoint a jailer "for whose

conduct he shall be responsible." (Doc. No. 100-1, p. 48) Ryals testified that, while ultimately he is responsible for the detention facility, personnel and inmates, the Jail Administrator is "hands on" at the facility. (Id., p. 4) That Jail Administrator is Defendant Riedmueller, who answers to Ryals' Chief Deputy, Matt Rice. (Id., p. 5) Ryals first became aware of the mold allegations during a meeting with his commanders, and he told Riedmueller to ensure that there was not a dangerous type of mold in the facility. (Id., pp. 5, 9)   After the ATOKA inspection took place, Ryals took a look at things and saw what looked like soap scum in the drain areas of the showers. (Id., p. 9) Riedmueller reported to him the findings from the ATOKA report and the fact that the Act 309 inmates were cleaning the cells. (Id., pp. 10-13) Ryals testified that he heavily relies on the commanders in each area of the facility to know and follow the policies and procedures governing those areas, and that he is not involved in drafting the policies for the facility. (Id., pp. 11, 13) He never met or talked with the Plaintiffs in this lawsuit and never hears complaints, as the grievances are handled at the facility level. (Id., pp. 9-10) He noted that Defendant Andrews is responsible for cleaning and inspections of Unit 1, and he did not speak with Andrews about these issues. (Id., p. 20)

Although Plaintiffs maintain that Ryals admitted to personal involvement with "red flag" issues, Plaintiffs provide no evidence of his direct involvement in or sufficient knowledge of the mold issue to support a finding of liability. He testified he does not hear complaints and did not receive any grievances about the issue, that he did not have conversations with any of the Plaintiffs, and that he heavily relies on his Jail Administrator and staff to operate the facility in accordance with the Jail policies and procedures. Therefore, the Court finds as a matter of law that Plaintiffs' claims against Defendant Ryals should be dismissed.

### 3. County Liability

A suit against a county official in his official capacity is the equivalent of a suit against the county itself. Liebe v. Norton, 157 F.3d 574, 578-9 (8th Cir. 1998). In order for a county to be held liable for the unconstitutional acts of its officials, Plaintiff must allege and prove that a written county policy or pattern of widespread unconstitutional conduct was the moving force behind the unconstitutional actions. Jane Doe A v. Special School District of St. Louis County, 901 F.2d 642, 646 (8th Cir. 1990).

While the Jail enacted numerous policies and procedures governing all aspects of the facility, including the health and safety of the inmates and the sanitation of the facility, county "liability may be established through proof that the alleged misconduct was so pervasive among the non-policy making employees of the municipality 'as to constitute a "custom or usage" with the force of law.'" McGautha, 36 F.3d at 56 (quoting Monell v. Dep't of Social Servs., 436 U.S. 658, 690-91 (1978)). In addition, "situations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability." Speer v. City of Wynne, Arkansas, 276 F.3d 980, 986 (8th Cir. 2002). In this case, the Court finds a sufficient dispute of fact concerning whether the alleged improper conditions at the Jail were the result of an unconstitutional custom or practice, thereby rendering the County accountable. Therefore, the Court finds that the allegations against Defendants Riedmueller and Andrews in their official capacities also should not be dismissed at this juncture.

## V.   Conclusion

IT IS, THEREFORE ORDERED that:

1. Defendants' Summary Judgment Motion is GRANTED in part, with respect to

19

Plaintiffs' claims against Defendant Ryals.

    2.    Defendants' Summary Judgment Motion is DENIED in all other respects.

IT IS SO ORDERED this 20th day of February, 2019.

_____
JEROME T. KEARNEY
UNITED STATES MAGISTRATE JUDGE