IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

SAM EDWARD THURMOND, SR., ADC #127149;                          PLAINTIFFS
KHALAN ELLINGTON, ADC #655082;
RASHAN DIXON, ADC #108165;
BOBBY RAY WYLES, JR., ADC #149401;
TERRY DON BEAVER, ADC #657603;
JEREMY TODD HALEY;

v.                          4:17CV00222-BSM-JTK
                            4:17CV00223-BSM-JTK
                            4:17CV00224-BSM-JTK
                            4:17CV00248-BSM-JTK
                            4:17CV00289-BSM-JTK
                            4:17CV00368-BRW-JTK

TIM RYALS, Sheriff, Faulkner County; et al.                      DEFENDANTS

**ORDER**

I.      **Introduction**

Before the Court are Plaintiffs' and Defendants' briefing on county liability (Doc. Nos. 116, 117, 119, 120) and Plaintiffs' Motion for Trial (Doc. No. 118). This Court previously found "a sufficient dispute of fact concerning whether the alleged improper conditions at the Jail were the result of an unconstitutional custom or practice, thereby rendering the County accountable." (Doc. No. 103 at 19). On August 28, 2020, the Eighth Circuit reversed and remanded this Court's order with respect to qualified immunity for the individual Defendants, but found it lacked jurisdiction with respect to the County's appeal. *See Thurmond v. Andrews*, 972 F.3d 1007, 1013-14 (8th Cir. 2020).[1] This Court ordered additional briefing on county liability in light of that opinion. (Doc. No. 115). Defendants have submitted a Motion for Summary Judgment (Doc. No. 117), and Plaintiffs have submitted a Response in Opposition (Doc. No. 116). For the reasons set

---

[1] Also available in this docket as Doc. 110.

forth below, the Court grants in part Defendants' Motion for Summary Judgment with respect to

Plaintiffs' failure to train theory but denies it with respect to Plaintiffs' unofficial custom theory.

## II.    Background

Plaintiffs are former inmates at the Faulkner County Detention Center ("Jail") who claim

they were housed in unconstitutional living conditions at different times between 2016 and 2018.

Since the facts have been sufficiently discussed in the February 20, 2019 Memorandum and Order,

(Doc. No. 103 at 2-8), and the Eighth Circuit's Opinion,  *see Thurmond*, 972 F.3d at 1010-11, this

Court will incorporate those fact sections by reference and address the relevant facts in its analysis.

## III.    Summary Judgment Standard

Pursuant to FED.R.CIV.P. 56(a), summary judgment is appropriate if the record shows that

there is no genuine issue of material fact and the moving party is entitled to judgment as a matter

of law. *See Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997). "The moving party bears

the initial burden of identifying 'those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Webb v. Lawrence County*, 144 F.3d

1131, 1134 (8th Cir. 1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (other

citations omitted)). "Once the moving party has met this burden, the non-moving party cannot

simply rest on mere denials or allegations in the pleadings; rather, the non-movant 'must set forth

specific facts showing that there is a genuine issue for trial.'" *Id.* at 1135. Although the facts are

viewed in a light most favorable to the non-moving party, "in order to defeat a motion for summary

judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine

dispute over those facts that could actually affect the outcome of the lawsuit." *Id.*

IV.     **The Eighth Circuit's August 28, 2020 Opinion**

Analyzing qualified immunity for the individual Defendants, the Eighth Circuit stated, "[g]iven both our limited jurisdiction and the presence of factual disputes in this case, we will begin and end our inquiry with the clearly established prong." *Thurmond*, 972 F.3d at 1012. It found that "a right to sanitary prison conditions" was too broadly defined for purposes of the clearly established prong and could not find "either 'controlling authority' or a 'robust consensus of persuasive authority' clearly establishing a right to be free from Cladosporium, mold, or other allergens in the prison context at the levels alleged here." *Id.* at 1013.

Turning to county liability, it noted its qualified immunity analysis relied exclusively on the "clearly established" prong which "does not necessarily mean Faulkner County did not violate the rights of the plaintiffs, and so the determination of liability does not flow from the resolution of the qualified immunity issue." *Id.* However, in footnote three, the court flagged that "in the past that the lack of a clearly established right can, in some instances, foreclose a plaintiff's claim of municipal liability." *Id.* at 1013, n.3 (citing *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393–94 (8th Cir. 2007) (en banc)). The Eighth Circuit went on, "[a]s that issue was neither briefed nor argued here, we leave it for initial consideration by the district court on remand." *Id.* Due to this, the Court decided to gather additional briefing on the issue of county liability.

V.      **Constitutional Right Versus Clearly Established Right**

As the Eighth Circuit made clear in its qualified immunity analysis for the individual Defendants, it only analyzed the clearly established prong and not whether Plaintiffs sufficiently alleged a constitutional violation. Still, Defendants place considerable weight on this passage from the Eighth Circuit's opinion:

> This is not to say that there can never be a case in which the presence of mold or another environmental allergen may give rise to unsanitary prison conditions that

3

violate inmates' Eighth Amendment rights. Nor does it mean that truly dangerous environmental conditions could not reach such a high level where the violation was obvious. *Hope v. Pelzer*, 536 U.S. 730, 738 (2002). But that is not the case here.

*Thurmond*, 972 F.3d at 1012. At first glance, this appears to suggest that no constitutional violation occurred. But in the sentences immediately preceding this passage, the Eighth Circuit clearly states it is not deciding whether a constitutional violation occurred:

> Because the right at issue has not been properly defined and there are genuine disputes of material fact at play, it is not possible for us to determine whether the individual officers committed a constitutional violation in the Faulkner County Detention Center due to the presence of Cladosporium. To do so would require us to delve into genuinely disputed facts beyond our jurisdiction.

*Id.* Thus, while the conditions alleged in this case were not so egregious that they would obviously violate Plaintiffs' *clearly established* rights to unsanitary prison conditions, the question remains whether Defendants' conduct did in fact violate Plaintiffs' rights to sanitary prison conditions.

## VI.    County Liability

"Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,'; or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Indep.*, 829 F.3d 695, 699 (8th Cir. 2016) (citations omitted). In their briefing, Plaintiffs advance the latter two theories of county liability: 1) Defendants had an unofficial "custom of ignoring and insufficiently addressing sanitation complaints, which subjected Plaintiffs to unconstitutional conditions of confinement," and 2) Defendants failed "to train [their] employees to diligently and effectively heed to its policies and procedures." (Doc. No. 116 at 5). Since the Eighth Circuit suggested that this Court consider the failure to train theory on remand, it will begin there.

### a.    Failure to Train

A municipality can be liable "for deficient policies regarding hiring and training police

4

officers where (1) the city's hiring and training practices are inadequate; (2) the city was deliberately indifferent to the rights of others in adopting them, such that the 'failure to train reflects a deliberate or conscious choice by a municipality,' and (3) an alleged deficiency in the city's hiring or training procedures actually caused the plaintiff's injury." *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (cleaned up). In its discussion of county liability, the Eighth Circuit flagged *Szabla*, and the Court will first address that case since it provides guidance on how to establish deliberate indifference for the second prong. *See Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393–94 (8th Cir. 2007) (en banc)).

### i. *Szabla and Clear Constitutional Guideposts*

In *Szabla*, police officers came upon an abandoned car that had struck a tree and went searching for the driver. *See id.* at 388. A canine unit was called in to aid the search, and since they were not sure if "they were looking for a criminal suspect or an innocent injured person, he [the handler] gave Rafco [the canine] the command to 'track,'" which directed the dog to bite or apprehend the person they were tracking. *Id.* Without prior warning, the canine ultimately bit the plaintiff who was sleeping in a nearby shelter even though they later determined he had nothing to do with the car. *See id.* Plaintiff sued the city claiming his dog bite resulted from the police department's deliberately indifferent failure to train their officers about the usage of force with canines. *See id.* at 389. Since the city's policy did not compel unconstitutional acts, the city's policy for the use of dogs was lawful on its face. *See id.* at 391. Plaintiff argued that the city's failure to have a more direct policy giving guidance on the use of canines resulted in the constitutional violations, but the Eighth Circuit opined that municipal liability in that situation attaches "only where a city's inaction reflects a deliberate indifference to the constitutional rights of the citizenry, such that inadequate training or supervision actually represents the city's 'policy.'"

*Id.* at 392. This inaction can either stem from a history of constitutional violations "such that the need for additional training or supervision was plain," or a single violation "accompanied by a showing that the municipality had 'failed to train its employees to handle recurring situations presenting an obvious potential for such a violation.'" *Id.* at 392-93 (citations omitted). There was no history of unreasonable use of dogs to apprehend suspects in this police department, so the Eighth Circuit treated it as a one-time incident for which there must have been an obvious potential for constitutional violations. "In determining whether the need for training or other safeguards was 'obvious,' however, we look to whether the employee violated a 'clear constitutional duty' and whether there were 'clear constitutional guideposts' for municipalities in the area." *Id.* at 393. It adopted its definition of clear constitutional guideposts from Justice O'Connor:

> The absence of clearly established constitutional rights -- what Justice O'Connor called 'clear constitutional guideposts,' -- undermines the assertion that a municipality *deliberately* ignored an *obvious* need for additional safeguards to augment its facially constitutional policy. This is not an application of qualified immunity for liability flowing from an unconstitutional policy. Rather, the lack of clarity in the law precludes a finding that the municipality had an unconstitutional policy at all, because its policymakers cannot properly be said to have exhibited a policy of *deliberate* indifference to constitutional rights that were not clearly established.

*Id.* at 394 (cleaned up). Since the requirement that officers in that situation "give advance warning before commanding a canine to bite and hold a suspect was not clearly established" at the time, the need for training "was not so obvious at the time of this incident that [city defendant's] actions can properly be characterized as deliberate indifference to [plaintiff's] constitutional rights." *Id.* at 393.

There are a few key distinctions between Plaintiffs' case and the facts underlying *Szabla*. First, this case does not involve a single isolated incident. Plaintiffs put forth that they and others filed multiple grievances and lawsuits about the mold issue. (Doc. No. 100-13 at 1-6 [Plaintiffs'

Grievances]). Second, unlike *Szabla* where an officer technically followed the department's policy, Plaintiffs argue that Defendants here violated their own cleaning policies: "what existed in the Policies and Procedures was not carried out by the employees to which these applied." (Doc. No. 116 at 10). They point to Section 023 of the Jail's Policies and Procedures which states "[t]he detention facility shall be kept in the highest degree of cleanliness possible. The cells and day rooms shall be maintained in a sanitary and orderly conditions," (Doc. No. 100-1 at 136) and Section 002 which states "[t]he conditions of confinement must be safe, sanitary, and orderly. The detention facility must provide for the basic sanitation and hygiene requirements of detainees." (Doc. No. 100-1 at 45). In the face of this, they claim "evidence of grievances over an extended period of time with no remedial measures supports failures in the training of officers to adhere to the Policies and Procedures." (Doc. No. 116 at 11). They go on, "the inadequacy of the employees' apparent preparedness to address a mold problem that can affect the health and well-being of detainees should have been patently obvious to the County's policymakers." (Doc. No. 116 at 11).

However, Plaintiffs do not put forth evidence of a history of constitutional violations relating to mold exposure at the Jail. *See Szabla*, 486 F.3d at 392. Therefore, these claims still fall under the same analysis as *Szabla* where the Court must decide "whether there were 'clear constitutional guideposts' for municipalities in the area" that would make the need for training obvious. *Id.* at 393. Thus, the central issue is: which of Plaintiffs' rights must the city be deliberately indifferent to?

### ii.  *Deliberate Indifference to the Rights of Others*

Plaintiffs argue the right at issue is the broader right to sanitary prison conditions, which is clearly established, but Defendants argue it is the more particular right to be free from these levels of Cladosporium, which is not. Defendants claim that while the Eighth Circuit did not identify the

right at issue,  it "held that the legal standard by which the Plaintiff's claim(s) should be adjudged

is not clearly established and that the broad, general 'right to sanitary prison conditions' was not

the appropriate standard." (Doc. No. 120 at 1-2). While a failure to follow one's own cleaning

policy could result in other violations of the right to sanitary prison conditions, Plaintiffs do not

allege that Defendants consistently ignored all requests for cleaning of all kinds. Instead, they

specifically allege that their complaints regarding mold were ignored. While Plaintiffs have the

right to sanitary prison conditions and the cleaning policies were probably meant to secure this

right, the city must have been deliberately indifferent to an "*obvious* need for additional

safeguards" due to potential constitutional violations arising from exposure to mold. *Szabla*, 486

F.3d at 394.  As the Eighth Circuit explained, it could not find controlling authority or sufficient

persuasive authority "clearly establishing a right to be free from Cladosporium, mold, or other

allergens in the prison context at the levels alleged here." *Thurmond*, 972 F.3d at 1013. Therefore,

it cannot be said that "the city was deliberately indifferent to the rights of others in adopting" its

training policy, since the right at issue here was not clearly established. *Andrews*, 98 F.3d at 1076;

*see also Szabla*, 486 F.3d at 394.

### iii.  Conclusion

As a result, Plaintiffs cannot proceed with a § 1983 claim against the County under a failure

to train theory and Defendants' motion for summary judgment is granted as to this claim.

### b.  Unofficial Custom

Plaintiffs also argue the County is liable under an unofficial custom theory. The Eighth

Circuit uses a three-prong test to determine the establishment of an unofficial custom:

> [A] plaintiff may establish municipal liability through an unofficial custom of the
> municipality by demonstrating '(1) the existence of a continuing, widespread,
> persistent pattern of unconstitutional misconduct by the governmental entity's
> employees; (2) deliberate indifference to or tacit authorization of such conduct by

8

the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.'

*Corwin*, 829 F.3d at 700 (citation omitted). The Court will address each prong in turn.

### i. *Prevalence of Pattern of Conduct*

There must be more than a few isolated alleged unconstitutional acts to establish a custom, especially when those acts represent only a small fraction of a wider pool of constitutional conduct. *Brewington v. Keener*, 902 F.3d 796, 802 (8th Cir. 2018) ("[I]n the face of an express municipal policy prohibiting excessive force, two incidents of excessive force—even assumed to be true—cannot be considered a pattern of widespread and pervasive unconstitutional conduct."); *Pineda v. City of Hous.*, 291 F.3d 325, 329 (5th Cir. 2002) ("one act is not itself a custom. There must be a 'persistent and widespread practice.'"). Plaintiffs argue the "the County employees' repeated misconduct of disregarding grievances, which put Defendants on notice of the presence of mold and its harm, was sufficiently pervasive to constitute an unofficial custom of the County." (Doc. No. 119 at 5). Defendant argues that since only "several inmates, the Plaintiffs in this case, complained about the same situation. This is not sufficient evidence of an unconstitutional custom." (Doc. No. 117 at 6).

In support of this proposition, Defendant cites *Brewington* and *Pineda. See id.* In *Brewington*, the plaintiff was kicked in the face by a police officer in violation of the county's written use-of-force policy. *See Brewington*, 902 F.3d at 799. Plaintiff "alleged that despite the written policy, the County Sheriff's Office had an unwritten rule, policy, or custom encouraging its officers to physically assault suspects who attempt to flee." *Id.* In support of this argument, plaintiff presented testimony from the deputy who kicked him that a sergeant "allegedly told Deputy Keener to whip, kick, hit, or do something to deter the arrestee" attempting to flee and

testimony about two prior incidents of excessive force. *See id.* at 801-802. First, the Eighth Circuit

found no basis for admission of Keener's hearsay testimony from the sergeant. *See id.* at 802.

Second, it found that "two incidents of excessive force—even assumed to be true—cannot be

considered a pattern of widespread and pervasive unconstitutional conduct." *Id.* Here, the Eighth

Circuit cited *Pineda* approvingly and summarized that case's holding as follows: "concluding that

eleven incidents were insufficient to establish an unconstitutional pattern." *Id.* Since plaintiff also

put forth no evidence that the Sheriff ever instituted the unofficial custom as a final policymaker,

the Eighth Circuit affirmed the District Court's grant of summary judgment in favor of the county

defendant. *See id.*

 *Pineda* involved a plaintiff who was shot and killed by Houston police officers "following

an unconstitutional warrantless entry into his residence." *Pineda*, 291 F.3d at 327. Members of the

deceased plaintiff's family sued the City of Houston alleging it had an unwritten custom of

warrantless searches or failed to train its officers with respect to Fourth Amendment's warrant

requirement and exceptions for warrantless searches. *See id.* at 328. Discussing the possibility of

an unwritten custom, the Fifth Circuit noted that plaintiffs put forth eleven reports of warrantless

searches out of five hundred reports involving narcotics. *See id.* at 329. The Fifth Circuit found

this insufficient to establish a pattern:

> Eleven incidents each ultimately offering equivocal evidence of compliance with
> the Fourth Amendment cannot support a pattern of illegality in one of the Nation's
> largest cities and police forces. The extrapolation fails both because the inference
> of illegality is truly uncompelling--giving presumptive weight as it does to the
> absence of a warrant--and because the sample of alleged unconstitutional events is
> just too small.

*Id.* at 329.

 Plaintiffs' claims here are distinguishable from *Brewington* and *Pineda.* Unlike *Pineda* and

*Brewington*, plaintiffs here allege more than just a few isolated incidents of misconduct amid a

wider pool of constitutional conduct. Instead, they claim that, within the pool of mold grievances

at the Jail, most grievances from both the Plaintiffs and others were ignored for an extended period

of time. (Doc. No. 119 at 3). In support, Plaintiffs cite Defendants' response to Interrogatory No.

7 where they stated they were "aware of the subject soap scum and bodily fluid build up in late

2016 due to detainees not cleaning the area properly." (Doc. No. 100-14 at 2). Between the named

Plaintiffs, Bobby Wyles first submitted a grievance for "black mold in the shower area and or

living area" on February 27, 2017, and the other five submitted grievances specifically identifying

the mold issue between February 27 and May 25, 2017. (Doc. No. 100-13 at 1-6). Defendant

Andrews responded to most of these grievances with assurances that the matter was being

addressed. *See id.* [2] Andrews also stated in his deposition that it took multiple grievances before

he presented the issue to Riedmuller:

> Q. Okay. Do you believe it took multiple grievances or multiple detainees to bring
> the issue up before you decided to suggest to Captain Ried Mueller [sic] that we
> perform power washing and perform painting?
> A. I believe so. I think that would be accurate.
> Q. It took a number of grievances?
> A. Right. Because just -- just to be honest, just because somebody is complaining
> don't mean that there's something wrong, you know. And so you have to take
> everything in a jail setting with a grain of salt.

(Doc. No. 100-3 at 20 [73:20-74:6]). In turn, Riedmuller brought up the mold issue after the

lawsuits were filed during a weekly commander meeting in which they ultimately decided to have

the environmental tests performed by ATOKA. (Doc. No. 100-2 at 33). Sheriff Ryals stated he

became aware of the complaints "from lawsuits actually coming across his desk," (Doc. No. 100-

1 at 5 [16:3-4]), and was first briefed about it in a weekly commander meeting "between the spring

and summer" of 2017. (Doc. No. 100-1 at 5 [16:21]). Finally, even after Riedmuller ordered the

---

[2] For instance, on April 18, 2017, Andrews commented "This is being addressed" in response to Rashaan Dixon's
April 4, 2017 mold grievance. (Doc. No. 100-13 at 5). On June 1, 2017, Andrews commented "This is a matter that
is being addressed" in response to Jeremy Haley's May 25, 2017 mold grievance. (Doc. No. 100-13 at 4).

ATOKA investigation, Riedmuller stated that they did not adopt any of the recommendations in the ATOKA report. (Doc. No. 110-2 at 72 [72:1– 9]).

Viewed in the light most favorable to the Plaintiffs and considering the evidence they have put forth, a reasonable jury could find a sufficient number of ignored mold-related grievances and recommendations to establish an "existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees." *Corwin*, 829 F.3d at 700.

### ii. Deliberate Indifference to or Tacit Authorization of Conduct

The second prong is a demonstration of "deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct." *Corwin*, 829 F.3d at 700. Unlike a failure to train theory, "[t]he Eighth Circuit's custom test does not require deliberate indifference to a constitutional right. Instead, the second element of the custom test requires 'deliberate indifference to or tacit authorization' of unconstitutional misconduct by municipal employees." *Riis v. Shaver*, 458 F. Supp. 3d 1130, 1201 (D.S.D. 2020). For this, the County need not be deliberately indifferent to the right of Plaintiffs to be free from these levels of mold; it need only be deliberately indifferent to its employees' conduct that potentially gives rise to the constitutional violation.

Policymaking officials are those who "possess[] final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). "[W]hether an official had final policymaking authority is a question of state law." *Id.* at 483. As county sheriff, Defendant Ryals was a policymaker since he had "the custody, rule, and charge of the jail within his or her county and all prisoners," and was authorized to "appoint a jailer for whose conduct [he was] responsible." A.C.A. § 12-41-502; *see also* A.C.A. § 12-41-503(a) ("County sheriffs and other keepers or administrators of jails within the State of Arkansas are

12

responsible for managing the populations and operations of their respective facilities in compliance with the laws and the Arkansas Constitution and within the requirements of the United States Constitution."). Ryals appointed Riedmuller as jail administrator for the Jail. (Doc. No. 100-1 at 6 [19:9-11]) ("I then promoted Lieutenant Ried Mueller [*sic*], I believe it was, to Captain Ried Mueller, and made him the administrator over the facility."). Per Section 002 of the Jail's Policies and Procedures, the duties of the jail administrator include "Policy development" (Doc. No. 100-16 at 2). Therefore, both Defendants Ryals and Riedmuller were policymaking officials with respect to the Jail.

Plaintiffs allege both Ryals and Riedmuller were deliberately indifferent to or tacitly authorized their employees' custom of disregarding these mold-related complaints. As discussed above, Riedmuller learned about the complaints from Andrews and eventually alerted Ryals about the complaints at a weekly commander meeting. (Doc. No. 100-1 at 5 [16:21]). However, Riedmuller could not recall visiting the cells himself to inspect them. (Doc. No. 100-2 at 40 [40:5; 40:7-10]). He also stated he asked Andrews's opinion on what the substance was at one point to which Andrews responded, "I don't believe it's mold. It looks -- it looks like sloughed-off skin cells to me." (Doc. No. 100-2 at 44 [44:2-4]). Finally, while Riedmuller was supposed to get involved if grievances were appealed, he states "I do not recall ever being made aware of an appeal being filed on the grievances." (Doc. No .100-2 at 45 [45:24-25]). Per Section 009 of the Jail's Policies and Procedures, "[t]he grievant may appeal any response or lack of response to the next level in the chain of command, who shall respond in writing." (Doc. No. 100-17 at 3). Further, the policy states "[i]f you are the supervisor that answered the first grievance, you can not answer the appeal. The appeal must be done by the next level supervisor." *Id.* at 2. At least one named plaintiff claimed Andrews answered their grievances as well as their appeals. (Doc. No. 100-6 at 52-53

13

[52:23-53:2]) ("When we dealt with Andrews, we filed a grievance to Andrews. He responds to the grievance. We appeal this decision. Then he ends up answering his own answer and when you file an appeal."). Finally, Riedmuller did not adopt any of the recommendations in the ATOKA report. (Doc. No. 110-2 at 72 [72:1– 9]).

Viewed in the light most favorable to the Plaintiffs and considering the evidence they have presented, a reasonable jury could find both Ryals and Riedmuller were deliberately indifferent to or tacitly authorized the Jail employees' alleged unofficial custom of disregarding mold-related complaints and recommendations. *See Corwin*, 829 F.3d at 700.

### iii.   Moving Force

Finally, Plaintiffs must show the unofficial custom was the moving force behind the constitutional violation. *See Corwin*, 829 F.3d at 700. To begin, Defendant argues "[t]hese allegations, however, even if they could be proven (they cannot), dictate summary judgment for the County because County policy cannot possibly be 'the moving force' behind an underlying constitutional violation where the policies in question were allegedly not followed." (Doc. No. 117 at 5). However, Plaintiffs do not claim the cleaning policy itself caused their injuries. Rather, they claim the custom of ignoring mold complaints, which may have even violated the cleaning policy, is the moving force.

Plaintiffs allege a variety of injuries that resulted from the mold exposure including "rashes, sinus issues, headaches, runny nose, skin irritation, itchy eyes, burning eyes, blurred vision, chest burn, cough, leg swelling, anxiety, difficulty breathing, and high blood pressure." (Doc. No. 116 at 7 [citing Plaintiffs' depositions]). The ATOKA report stated that Cladosporium "does not present a deleterious health effect for individuals living within the confines associated with the sporadic mold colonization in the showers and nearby ceilings." (Doc. No. 100-4 at 9).

However, when asked about this conclusion in his deposition, Plaintiffs' expert Dr. Jim Ingram disagreed: "if somebody is allergic to cladosporium and they are exposed to it, then it can cause health effects -- deleterious health effects." (Doc. No. 100-12 at 12-13 [44:25-45:3]).

Accordingly, upon finding an unofficial custom of disregarding mold-related complaints, a reasonable jury could also find this custom was the moving force behind unconstitutional sanitary conditions of prolonged exposure to this mold which caused Plaintiffs' injuries.

### iv.  Conclusion

The Court finds Plaintiffs have sufficiently alleged an unofficial custom since genuine disputes of material fact exist concerning whether the alleged improper conditions at the Jail were the result of an unconstitutional custom.

### VII.   Conclusion

Therefore, the Court grants in part Defendants' Motion for Summary Judgment (Doc. No. 117) as to Plaintiffs' failure to train theory but denies it in part as to Plaintiffs' unofficial custom theory. Plaintiffs' Motion for Trial (Doc. No. 118) is granted. A trial setting will follow.

IT IS SO ORDERED this 9th day of March, 2021.

JEROME T. KEARNEY
UNITED STATES MAGISTRATE JUDGE